Next SIPCO case is SIPCO v. Emerson Electric, 2018-1986. Mr. Gonsalves. May it please the Court, this appeal involves only two claims. Although the petitioner challenged nine claims of the 661 patent, the Board instituted on only three and ultimately canceled only two claims. The Board's obviousness ruling on these two claims should be reversed because it is based on an improper claim construction. It is easiest to understand the claim construction issue for Claim 5 by referring to Figure 3D at page 48 of the appendix. Figure 3D shows a sensor identified by number 310 in the upper middle portion. The output of the sensor is sent to a data controller identified by the number 324 via a data interface identified by the number 321. As indicated in the specification at page 65 of the appendix, column 9, lines 7 through 19, the sensor in its simplest form could be a two-state device such as a smoke alarm. The data controller, going back to Figure 3D, which is identified by number 324, encodes the data from the sensor into a code using the table at 325. As explained in the specification at page 65 of the appendix, column 9, lines 48 to 49, the data controller is configured to apply a specific code consistent with the input. The encoded electrical signal of the sensor is then formatted along with the transceiver ID, which is shown in Figure 3D as item 328, into a message 330 for transmission to the local gateway, which is identified by 210 via the radio frequency transceiver identified by 350. So consider a smoke alarm. A smoke alarm has two outputs. Either the concentration of the reactants of combustion exceeds a certain threshold in the air, and then it says you have a smoke problem, or it's less than that. So that's the output you get from a sensor, but that's not what the claimed invention sends. The claimed invention takes that and then converts it to a code, and exemplary codes are shown in the table. So that is what is covered by the claims, that the specification requires two separate steps. It requires encoding the electrical signal generated by the sensor and then formatting the encoded signal along with the transceiver ID for radio frequency transmission. And so what is it that tells us that even if Figure 3D has this two-step process, that that's required by the claims, as opposed to simply one way of coming within the claim? Okay, so can you please, Your Honor, look at Claim 5, which is at page 70 of the appendix, column 19, beginning at line 17? And this claim at that location recites, consistent with the specification, a transmitter that is configured to perform two separate and independent tasks. One is to encode the electrical signal that was generated by a sensor. And the second is to transmit the encoded electrical signal and transmitter identification information in a radio frequency signal. So the transmitter that's recited in the claim has to perform two separate tasks. In fact, the second task that it performs, encoded electrical signal being included in the radio frequency signal, the word the appears before encoded electrical signal, so it's clearly referring to what was encoded in that first configuration of the transmitter. So the Board's overly broad construction of encoding as encompassing formatting data for RF transmission is incorrect for three reasons. Number one, it's inconsistent with the specification, as I just explained with respect to Figure 3D. Number two, it's inconsistent with the language of Claim 5, which requires two distinct configurations of the transmitter. And number three, a person of ordinary skill in the art would not have understood the claim term encoding to encompass putting data into a message for transmission. There isn't a document in the record in this case that says that merely putting a message, putting data into a message and transmitting it, is encoding the data. Nor am I aware of any document that's ever been written that says such a thing. For example, if I write a letter to my mother, it doesn't become encoded just because I stick it in an envelope before I send it. The envelope has additional information from my mother's address, but it doesn't change the content of the letter that I'm sending to my mother. The Board's flawed claim construction requires reversal of its conclusion that the prior art would have taught the encoding limitations. The Board based its obviousness conclusion for the encoding claim limitation solely on Mason. Emerson relies heavily on an annotated version of Mason's Figure 3. I think you can understand this appeal. I showed you the picture from Figure 3D. And you can look at the annotated picture in Emerson's brief, the red brief at page 9. This annotated version of the figure and the accompanying text in Mason shows that the data read from the meter is not encoded, but instead is merely placed in a data packet for transmission. If you're looking at the annotated figure on the red brief at page 9, it shows that the metered data, which is shaded in pink, is merely placed into a data packet in the ANSI meter protocol. Additional data is added to the front, which is a header, and added to the end, that's both shaded in beige. But the metered data that's shaded in pink does not change. Again, in turn, the ANSI meter protocol packet is merely placed within the data packet in the CE bus radio frequency protocol. Additional data is added to the front and the end, both shaded in yellow. But again, the meter-specific data, the data that was read from the meter, which is shaded in pink, itself is not encoded by either the ANSI meter protocol or the CE bus RF protocol. And this is significant because Claim 5 of the 661 patent explicitly requires not just any data to be encoded, but instead a particular signal, the electrical signal generated by a sensor. So there's a big difference between what Mason does, which is just put metered data into a packet for communication, and what the 661 patent claims, which is when you look at figure 3D, you read information from a sensor and you don't send that information. Rather, you first go to a table, you encode it, and you put the code in that you're sending. I looked for the terms encode and decode in Mason. I did a search with the computer because that's more accurate than what I can do by just looking at it with my eyes. I didn't see encode, decode, or any synonyms thereof anywhere in Mason. With respect to the second claim construction issue for Claim 6, Emerson and the board improperly construed the claim limitation of a transmitter configured to transmit a relatively low power radio frequency signal. The board construed the claim limitation of a transmitter configured to transmit a relatively low power radio frequency signal such that a transmitter that used repeating transceivers transmits a relatively low power radio frequency signal. But this construction is not consistent with how a person of ordinary skill in the art would have understood that term as used in Claim 6 in light of the specification. Because a person of ordinary skill in the art would have realized that the power of a signal sent by a transmitter depends on the electrical characteristics of the transmitter itself. It doesn't depend on the presence or absence of repeaters. On that point, didn't the board say you've kind of misunderstood what the argument is and what we're saying, which is it doesn't depend on the presence or absence of receivers, but the presence of nearby receivers is an indication of the relatively low power limitation being used. Right, I have two responses. Number one, there really isn't an alternate claim construction anywhere in the final written decision. It seemed like the only claim construction that they gave was dependent on the presence of repeaters. And secondly, Dr. Ralmaroff, who is an IEEE fellow, by the way, is very good at communications. He gave examples in the electrical communication. He gave examples where the same transmitter, you're looking at a transmitter that has a particular power level, and under the board's interpretation, that same transmitter that has one power level could be considered to have both a relatively high power and simultaneously a relatively low power, depending upon whether there was a repeater. So if there was a repeater, they would say, oh, this transmitter is relatively low power. And if there was not a repeater, it would say, oh, this transmitter is relatively high power. But the same transmitter can't be relatively high power and relatively low power because it only has one power, and that's it. So that's why the board's construction is illogical. The board's decision, the board's flawed claim construction requires reversal of its conclusion that the prior art would have taught the relatively low power claim limitation of Claim 6. The board ruled that Claim 6 was obvious because Emerson's petition asserts that because Mason discloses that its radio units are nearby repeaters, in order to effectively communicate, a person of ordinary skill in the art would understand Mason's radio units transmit a relatively low power radio frequency signal. But as I explained before, that type of reasoning is based upon a flawed claim construction. Mason does not use the word nearby or any synonym thereof, like, for example, close by. So there's no indication in Mason that its transmitters are low power. Counsel, you're into your rebuttal time. Do you wish to save it or continue? I'll continue for 10 seconds. All right. Okay. The other point I want to make is combining with Cunningham, the board indicated that if you use the low power transmitters of Cunningham into Mason, then you'd come up with that particular claim limitation. But as explained by Dr. Almaroth, a person of ordinary skill in the art would not have been persuaded to do such a thing. For instance, if you lower the power, then you need more transceivers. And so it would make the system more complicated. In addition, there was an assertion made that if you lower the power, you decrease the interference. Well, you would decrease the interference on that particular transmitter. But because you're using a low power transmitter, you'd have to use many more transmitters. And so the aggregate interference from those many transmitters would have to be considered. Thank you, Counsel. Mr. Davis? Hey, Police Court. With respect to the two claim terms in dispute, encoded electrical signal and relatively low power signal, the board properly applied the plain language of the claims and rejected CITCO's attempts to try to read additional limitations into the claims. In addition, substantial evidence supports the board's findings that prior art discloses these particular limitations, particularly due to the parallels between the prior art and the disclosure in the 661 patent itself. For these reasons, the board's findings of Claims 5 and 6 are unpatentable should be affirmed. Turning first to the first limitation in dispute, the encoded electrical signal. Claim 5 simply requires that the transmitter encode the electrical signal from the sensor and then transmit that encoded electrical signal in an RF signal. The board properly construed the term to simply be encoded information representing the electrical signal generated by the sensor. That's at Appendix 13. Notably, CITCO's own construction of that same term is consistent with that. It's a code generated from an electrical signal that was generated by a sensor from a physical condition. That's at Appendix 577. CITCO has since run away from that proposed construction on appeal here because it undermines the argument that they're attempting to pursue. They're trying to carve out from the claims or read an additional limitation into the claims that would preclude or exclude RF protocol conversion from being part of the potential encoding scheme. The board properly rejected that argument below. Opposing counsel also referenced a particular passage in the specification that was addressing the idea of encoding. This is at Appendix 65, Column 9, Lines 46 to 52. There it's discussing the idea that there could be a whole bunch of different encoding schemes, a whole bunch of different codes, but as long as the sender of the particular message and the receiver of the particular message understand what that encoding scheme is, that's encoding. There's nothing further or there's nothing additional required beyond that. Just like the encoding schemes that CITCO's pointing to in the context of the 661 patent, Mason discloses the same concepts. Page 27 of the red brief has a couple of excerpted figures, figure 3 and figure 1 from Mason that help explain what its disclosures are. In figure 1, you have a series of different meters that are communicating via RF with one another as well as with the RF node collector. That information is then taken and then transmitted from the RF node collector, which is the equivalent of the claim gateway, and sent over to the computer. On the right-hand side of that page, you have the particular encoding schemes that are applied in each and every one of these levels. At the very bottom of figure 3, you start off with the meter data. That is then encoded into the ANSI meter protocol. That is then encoded into the CBIS RF protocol, and that CBIS RF protocol is used to then send the information around that particular network. And then when it gets to the gateway, it's encoded into TCPIP and then sent along to the computer on the other side of a wide area network. With respect to the particular data fields that are inside of each of these encoding schemes, they're described in Mason at column 15. At several different points, it's talking about the particular ANSI encoding scheme that's used inside of the CBIS RF protocol, referring to table data as well as the particular encoding scheme details. For example, at column 15, lines 49 through 53, explaining that table data also is accompanied by a 1-byte acknowledgement code, a 2-byte length field, and a 1-byte checksum, which has to go along with the table data as part of that particular encoding scheme. CIPCO's arguments that none of the fields in the CBIS protocol or the ANSI protocol is simply indefensible. It's effectively looking for some type of ipsis verbis or in hyperba disclosure. As he said, he's looking solely for the words encoded. That's not the test here. The test that should be applied and that the board properly applied is whether or not encoding is actually performed, not only to the disclosure. If you think about his analogy to putting something in an envelope, at least one way, and I may be incorrect, that one might understand what they're saying about figure three is that's a series of nested packagings, but there's no encoding of what ends up inside the four envelopes. Your Honor, I would disagree that there's no actual encoding there. I think that's further described. Figure three is a helpful illustration of what's happening, but if you look at column 15 of the Mason disclosure, you'll see that data that comes in from a sensor needs to be then converted into bits and bytes, ones and zeros, and a particular encoding scheme. If there wasn't an encoding scheme, the recipient on the other end would just be getting ones and zeros and wouldn't have any idea what it meant. There has to be an encoding scheme there. That data is then formatted into particular tables, as is disclosed in column 15, as well as adding on checksums, length fields, acknowledgement codes. It's all part and parcel of the particular ANSI encoding scheme that needs to be used for the meter data that is to be sent across. The board also credited Mr. Kinney, who is Petitioner's Expert's testimony on this. This is at appendix 738 at paragraph 119, where he testified and the board recognized. I would also note that this was cited at appendix 191 of the petition. A person of skill in the art would understand that Mason's transmitter, which is called the CBIS RF board, encodes the electrical signal it receives from the sensor so that communications can be made using the CBIS and ANSI C1218 protocols. If there's not any further questions on that limitation, I'll turn to the next limitation in dispute, relatively low power signal. Here again, substantial evidence also supports the board's findings. The board actually had two findings. Not only does Mason disclose this expressly, but also Mason, in light of Cunningham's expressed teachings of a low power signal, also rendered the limitation obvious. The board doesn't even need to reach the claim construction issues that CIPCO tries to raise on this, or Mason's disclosure, because Cunningham itself expressly discloses a low power signal. The only dispute between the parties is whether or not there would have been a motivation to combine, but here again, CIPCO is left empty-handed. It was undisputed below that there was a particular motivation to combine, that you have less interference when you're using a relatively low power signal versus a higher power signal. CIPCO had put in evidence from their expert that it might be more costly, or it might be more complicated to use low power signals. That's not the test. The test is whether or not there would have been a motivation to actually apply these teachings from Cunningham, and the board found that there would be. Also crediting Mr. Kinney's testimony, again, at Appendix 743, paragraphs 129 to 131. But in addition to that, the board also found correctly that in light of Mason's teachings, that you needed to use repeaters in order to reach inaccessible meters. That also would have meant to a person of ordinary skill on the earth that you are using a relatively low power signal, as opposed to a high power signal. Crediting, again, Mr. Kinney's testimony on that point at paragraph 129 at Appendix 743. The board's findings are, and I think to your question, Judge Taranto, the board wasn't construing the claim there. It was simply observing, just like in the specification, when you're using repeaters as opposed to simply using a higher power signal, you are therefore, or a person of ordinary skill on the earth would have properly understood, that you're using a relatively low power signal as opposed to a higher power one. That's for each of these reasons. The board's findings are supported by substantial evidence. If there's not any further questions. Thank you, counsel. Thank you. Mr. Gonsalves has a little rebuttal time. We'll give you two minutes. Thank you, Your Honor. Opposing counsel indicated that I was importing limitations into the claim. I did no such thing. I'm explaining what the word encoded means. That was the idea of the claim construction portion of the brief. But why doesn't encoded as a term cover what goes on when you encapsulate information inside a package with several different parts for compliance with the communication protocol, like the top four bars on the five bar figure three? Well, the claim requires a particular. It doesn't require encoding just any data. The claim, if you look at claim five, it requires encoding a particular data item, the electrical signal that was generated by the sensor. So that's the thing that the claim requires to be encoded. And that thing, as indicated by the picture, is not adjusted. And this is very different than what's in the specification. I think Mr. Davis says it is adjusted in at least the sense that there are translations into bits and the addition of some bits for like a checksum, probably more than one bit, but some checksum bits and other things. So it may look like it's just being put into a section of a larger package, but in fact there's some adjustment of the data going on. Well, the checksum that you mentioned would be an additional field. And checksums are used to determine if the transmission was done correctly. So, for example, a checksum would ensure that the entire message has either an odd number of bytes or an even number of bytes. And if you get to the receiver and you find out it doesn't match with what was sent, then you know that. So that would be outside. Let's call it the dark red. Right. That was an example of just additional data. And if you look at the figure 3D again, there's two items that are put in the message. One is a transceiver ID, and the second is the encoded electrical signal that comes from a sensor. Well, there's no allegation that the transceiver ID that's just put in the message is encoded. And in fact it isn't. So the point I'm trying to make is that merely putting data in a message is not encoding. If it were, then the transceiver ID data that is merely put into the packet would also be considered to be encoding. And it's not. The figure 3D and the claim are crystal clear. Two data items are sent in the message. One is not encoded. One is encoded. To encode it, you have to do a separate step. You have to go on that table that's shown in figure 3D. Thank you, counsel. And that's separate. The case is submitted.